IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Audrey Lucille Ladson, ) | |
| ) | Civil Action No. 6:13-484-RBH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on May 26, 2010, alleging that she became unable to work on November 7, 2007. The applications were denied initially and on

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

reconsideration by the Social Security Administration. On December 17, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Kristan V. Sagliocco, an impartial vocational expert, appeared on July 14, 2011, considered the case *de novo* and, on August 31, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied review on December 20, 2012. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.
>
> (2)    The claimant has not engaged in substantial gainful activity since November 7, 2007 (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: major depressive disorder, posttraumatic stress disorder ("PTSD"), and mild mental retardation (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is 50 years old, completed the seventh grade, and does not have a GED. She can read at the 6.5 grade level, spell at the 4.7 grade level, and perform arithmetic at the 3.2 grade level. The claimant can perform simple, routine, repetitive tasks, but must avoid interaction with the general public, and must avoid close proximity and more than casual interaction with coworkers. Additionally, the claimant must avoid work requiring coordination with coworkers.

>    (6)    The claimant is capable of performing past relevant work as a housekeeper. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).
>
>    (7)    The claimant has not been under a disability, as defined in the Social Security Act, from November 7, 2007, through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

>    the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

3

A plaintiff is not disabled within the meaning of the Act if he or she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his or her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his or her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

*Medical Evidence*

The record reflects no medical treatment between November 2007, when the plaintiff alleges she became disabled, and May 2010, when the plaintiff applied for DIB and SSI. On August 4, 2010, the State Disability Determination Department referred the plaintiff for a consultative psychological examination with Cashton Spivey, Ph.D. (Tr. 236-39). The plaintiff reported emotional distress as a result of being stabbed and coping with her mother's death in 2005. She stated that she left school in the eighth grade and was in mainstream classes, earning mostly Cs and Ds. She said that she was presently unemployed, but worked at a fast-food restaurant until 2007. The plaintiff denied being hospitalized or taking medication, but reported headaches and memory deficits in addition to symptoms of depression and anxiety (Tr. 236). She also reported difficulty sleeping, reduced appetite and energy, lack of trust in others, generalized feelings of anxiety, and nightmares. She stated that she had fair attention/concentration, with no suicidal/homicidal ideation or hallucinations. With regard to her activities of daily living, the plaintiff indicated that she lived with her sister; bathed and dressed independently; prepared simple meals; no longer drove an automobile; could read a newspaper and do simple arithmetic; managed her own finances; did laundry and dishes; and enjoyed board games (Tr. 237).

Dr. Spivey noted that the plaintiff was cooperative and appropriately dressed and groomed. Her thought processes were logical and coherent; her attention and concentration were fair; her speech was normal; she maintained appropriate eye contact;

5

and her psychomotor functioning was within normal limits (Tr. 237). On August 4, 2010, Dr. Spivey administered the Wechsler Adult Intelligence Scale Fourth Edition ("WAIS-IV") test (Tr. 237-39). The plaintiff achieved a full-scale IQ score of 67, placing her within the mentally retarded ("intellectually disabled") range of cognitive ability.[3] Dr. Spivey noted that the plaintiff's true IQ was somewhere in the 64-72 range. Further testing suggested significant visual-motor deficits and yielded reading and spelling scores in the borderline range and math scores in the intellectual disability range (Tr. 238-39). Dr. Spivey diagnosed the plaintiff with major depressive episode, post-traumatic stress disorder ("PTSD"), and mild intellectual disability, and assessed a current Global Assessment of Functioning ("GAF") score of 45, with a high of 50 over the previous 12 months (Tr. 239).[4]

On August 13, 2010, State agency psychologist Lisa Clausen, Ph.D., opined that the plaintiff's mental impairments caused mild limitations with respect to her activities of daily living; moderate limitations with respect to her ability to maintain social functioning and concentration, persistence, or pace; and no episodes of decompensation (Tr. 242-55). She concluded that the plaintiff's mental limitations did not meet the criteria for Listings 12.02 (organic mental disorders), 12.04 (affective disorders), 12.05 (intellectual disability), or 12.06 (anxiety-related disorders), noting that the plaintiff appeared to be capable of at least simple, unskilled work and had not sought treatment or medication, which would likely prove beneficial (Tr. 242-55). *See* 20 C.F.R. pt. 404, subpt. P, app. 1 ("the Listings"), §§ 12.02, 12.04, 12.05, 12.06. Dr. Clausen also completed a Mental Residual Functional

---

[3] Effective August 1, 2013, while this case was pending, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.

[4] GAF measures a clinician's subjective judgment of an individual's overall level of psychological, social, and occupational functioning at the time of the assessment. *See* Am. Psychiatric Assoc., *Diagnostic & Statistical Manual of Mental Health Disorders* ("DSM-IV") 32 (4th ed. 2000). GAF scores in the 41-50 range signify "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id.* at 34.

6

Capacity ("RFC") Assessment, opining that the plaintiff: could perform simple tasks for at least two-hour periods; would be expected occasionally to miss a day of work due to her symptoms; should avoid continuous interaction with the general public; could perform single, repetitive tasks without special supervision; and could attend work regularly and accept supervisory feedback (Tr. 256-58).

On August 18, 2010, the plaintiff presented to Charleston Mental Health Center for an initial evaluation (Tr. 262-71).  She reported that she had "a lot of crying spells and my sister thinks that I am trying to hurt myself."  She said that she isolated herself and that her symptoms had gotten worse since her mother died in 2005.  The plaintiff complained of poor sleep, decreased energy, a history of violence and sexual abuse by her father, poor concentration and appetite, and suicidal thoughts, which she did not act upon because her mother told her that God would not forgive her for killing herself.  She denied hallucinations or homicidal ideation.  She reported that she had relationships only with immediate family, but did attend church.  During the evaluation, she was observed rocking in her car[5] and was tearful at times.  The plaintiff attributed her social anxiety to her father's abuse, her mother's death, and the traumatic effects of an incident nine years earlier in which her boyfriend attacked her with a knife (Tr. 263).  Upon mental status examination, the plaintiff had a depressed mood and blunted affect, but was cooperative; made fair eye contact; dressed neatly with good grooming; had appropriate thought processes; had good insight and judgment; and was able to recognize that she had a mental disorder requiring medication and treatment (Tr. 263, 265-66).

Stephen Baker, M.D., a psychiatrist, diagnosed the plaintiff with recurrent major depressive disorder and PTSD, and assessed a GAF score of 55.[6]  He prescribed

---

[5] The clinician may have meant "chair" but it is not clear from the record.

[6] GAF scores in the 51-60 range signify "[m]oderate symptoms (e.g., flat affect and circumstantial (continued...)

7

Celexa and Trazodone (Tr. 269). During a follow-up appointment in September 2010, the plaintiff continued to report symptoms of depression and PTSD, but denied suicidal/homicidal ideation or hallucinations. She stated that she was presently living with her sister and that the extra support was very beneficial to her (Tr. 270). The attending psychiatrist assessed a GAF score of 60 (Tr. 271).[7]

On November 23, 2010, State agency psychologist Camilla Tezza, Ph. D., reviewed an updated record and affirmed most of Dr. Clausen's earlier assessment, but clarified that the plaintiff would likely have difficulty understanding, remembering, and carrying out detailed instructions, as well as working in close proximity or coordination with coworkers (Tr. 274-90).

In separate visits in November 2010 and December 2010, Elizabeth Leonard, M.D., noted that the plaintiff's symptoms were improving with medication and assessed GAF scores of 60 (Tr. 292-95). She prescribed Prazosin to help the plaintiff sleep better (Tr. 294-95). In January 2011, the plaintiff was having fewer nightmares, and her sleep, appetite, and energy were good (Tr. 296). She still had some problems with mood and concentration, but reported that she was leaving the house with her sister and had gotten together with family over the holidays. She still feared leaving the house alone, but denied panic attacks, sadness, psychotic symptoms, or suicidal/homicidal ideation (Tr. 296). Dr. Leonard scheduled the plaintiff to follow up in three months (Tr. 297).

During her follow-up appointment in April 2011, the plaintiff said that she was doing better and feeling happier since her last appointment. She was taking her medication without side effects, sleeping well, her appetite was intact, and her nightmares and

---

[6](...continued)
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." DSM-IV at 34.

[7] A GAF score of 60 represents the least severe end of the "moderate symptoms" range. DSM-IV at 34.

8

flashbacks were more infrequent. She reported decreased energy over the previous two weeks, but attributed it to "feeling a little down" around the anniversary of her mother's death. The plaintiff was getting out of the house more to attend family functions, but still avoided going out alone (Tr. 298).

In June 2011, Dr. Leonard completed a "Mental Impairment Questionnaire," wherein she opined that the plaintiff was at most mildly limited in activities of daily living, but had extreme difficulties in social functioning; marked difficulties maintaining concentration, persistence, or pace; and experienced "one or two" repeated episodes of decompensation within the past year, each lasting at least two weeks (Tr. 307-08). Dr. Leonard did not provide dates for these episodes nor are they documented in her treatment notes. Dr. Leonard opined that the plaintiff would be unable to attend work regularly; work in proximity or coordination with others; make simple work-related decisions; maintain a regular work schedule; perform at a consistent pace without unreasonable breaks; understand, remember, and carry out detailed instructions; set realistic goals and work independently; deal with the stress of skilled or semi-skilled work; interact appropriately with the public; travel in unfamiliar places; nor use public transportation (Tr. 306-07). She indicated that the plaintiff did not have a low IQ or reduced intellectual functioning, but that her anxiety contributed to an increased perception of physical pain, particularly in the area where she had been stabbed (Tr. 307). Dr. Leonard estimated that the plaintiff would need to miss more than four days of work per month (Tr. 308).

In August 2011, the plaintiff underwent a consultative psychological examination with Sherry Rieder, Ph.D. (Tr. 310-18). The plaintiff reported that she could not work because she had been diagnosed with a leaking heart valve in May 2011,[8] and

---

[8] In a May 2011 treatment note, Donald Sanders III, M.D., diagnosed the plaintiff with atrial fibrillation, low blood platelets, and aortic regurgitation; however, he did not assess any medical restrictions and sent the plaintiff home with instructions to "live a cardiac healthy lifestyle and follow
(continued...)

9

that her depression and poor reading skills also made it difficult to work. She said that she had a "meltdown" at work in 2007 after which she left and never returned. She reported feeling "sort of down" and endorsed frequent feelings of hopelessness, worthlessness, excessive guilt, anhedonia, passive suicidal ideation, and poor appetite and energy level (Tr. 310). The plaintiff told Dr. Rieder that she spent "all day in bed because she lacks the motivation to get up"; her sister sometimes needed to remind her to maintain her personal hygiene; she helped wash dishes and prepare simple meals, but left most household tasks to her sister; she did not drive because she did not want to go anywhere; and she spent most of her day watching television (Tr. 310).

The plaintiff achieved a full-scale IQ score of 53 on the WAIS-IV test, which represented a 14-point decrease from her August 2010 score and would have placed her in the extremely low range of intellectual functioning (Tr. 311). However, Dr. Rieder noted that the plaintiff's apparent lack of confidence may have negatively impacted her performance and produced results that underestimated her actual abilities (Tr. 310). She remarked that it was "unusual for IQ scores to change by such a large magnitude, especially in only a year's time," and that, "[i]f anything, [the plaintiff's] scores would be expected to have increased due to her previous exposure to the test" (Tr. 311). The plaintiff's index scores and academic achievement scores had decreased significantly as well (Tr. 311-12; *see* Tr. 238-39). Dr. Rieder noted that the change in achievement scores was "especially noteworthy[,] as crystallized abilities, such as reading, are resistant to decline over time, even in light of other cognitive decline" (Tr. 312).

Dr. Rieder observed that, despite the unusual decline in the plaintiff's test scores, "the overall diagnostic impression for her case remains the same," with significant symptoms of depression and PTSD rendering it "unlikely that she can maintain even simple

---

[8](...continued)
up with me in six months" (Tr. 301).

and routine employment, such as the food service work she has done in the past" (Tr. 313). She assessed a GAF score of 50, which represents the least severe end of the "serious" symptoms range. DMS-IV at 34. Dr. Rieder attributed the plaintiff's incapacity to a combination of low intellectual functioning and significant psychological distress and further opined that her symptoms would make it difficult for her to interact with others, especially strangers (Tr. 314-15). Dr. Rieder also stated that the plaintiff had benefitted from treatment and might regain her ability to work if her symptoms continued to improve (Tr. 313).

In addition to the report relating to the plaintiff's evaluation, Dr. Rieder also completed a "Medical Source Statement of Ability To Perform Work Related Activities (Mental)" (Tr. 314-16). In this form, Dr. Rieder opined that the plaintiff has moderate limitations with regard to understanding, remembering, and carrying out simple instructions, as well as in her ability to make judgments on simple work-related decisions. Dr. Rieder opined that the plaintiff is moderately limited in her ability to interact appropriately with supervisors and coworkers; however, she also indicated that she is markedly limited in her ability to interact with the public and respond appropriately to usual work situations and to changes in routine work setting (Tr. 314-15). Moreover, Dr. Rieder also stated in the form that "[t]he combination of low intellectual functioning (in the mild mental retardation range) & significant psychological distress interact to impair Audrey's comprehension abilities, even for fairly simple tasks" and that "Audrey's impaired comprehension and psychological distress (especially PTSD), make it difficult for her to interact with others, especially strangers" (Tr. 314-15).

*Plaintiff's Testimony and Statements*

At her July 2011 hearing, the plaintiff testified that she "just snapped" during an incident at work in 2007, after which she "went home and [she] stayed in the house and [she] never came back out." She testified that she "had some money saved up" and "just

stayed in the house" until 2009, when her sister convinced her to leave.  The plaintiff said that the first time she sought treatment was in August 2010, when her sister took her to see Dr. Spivey (Tr. 40-41).

***Vocational Expert Testimony***

The ALJ asked the vocational expert to consider a hypothetical individual, with the same age, education, and work history as the plaintiff, who had the capacity to perform work at all exertional levels, except that she was limited to simple, routine, repetitive tasks; was required to avoid interaction with the general public; and could not work in close proximity or coordination with coworkers (Tr. 49).  The vocational expert testified that such an individual could perform light, unskilled work as a housekeeper (800,000 jobs nationally; 16,000 statewide), laundry sorter (400,000 jobs nationally; 8,000 statewide), or packager (700,000 jobs nationally; 48,000 statewide); and the medium, unskilled work as a cleaner (4.5 million jobs nationally; 29,000 statewide), laundry worker (220,000 jobs nationally; 3,400 statewide), or packager (700,000 jobs nationally; 10,000 statewide) (Tr. 50-51).

## ANALYSIS

The plaintiff was 47 years old on the alleged disability date, and she was 50 years old on the date of the ALJ's decision.  She has an eighth-grade education and previously worked as a housekeeper, cafeteria attendant, and fast food worker.  The ALJ determined that the plaintiff had the RFC to perform a full range of work at all exertional levels with some nonexertional limitations.  The plaintiff argues that the ALJ erred by (1) failing to give proper weight to the opinions of her treating physicians, (2)  finding that she is capable of performing past relevant work as a housekeeper, (3)  failing to comply with the provisions of Social Security Ruling ("SSR") 82-62 in the assessment of her past relevant work, and (4) finding that the plaintiff is not disabled, as the Commissioner failed to carry her burden of proof at step five of the sequential evaluation process.

The Commissioner contends that substantial evidence supports the ALJ's determination that the plaintiff was not disabled through the date of the decision (doc. 27 at 11). Specifically, the Commissioner contends: (1) the ALJ properly weighed the medical opinion evidence, including the opinions of the non-examining State agency psychologists, the examining psychologists, and the treating psychiatrist (doc. 27 at 12-17); (2) substantial evidence supports the ALJ's finding that the plaintiff could adjust to other work (doc. 27 at 17-20); and (3) even if the ALJ erred in determining that the plaintiff could perform her past relevant work, the error was harmless because the vocational expert testified that a person with the plaintiff's RFC could perform a significant number of other jobs (doc. 27 at 20).

In the her response brief, the plaintiff reiterates her contention that the ALJ improperly rejected the findings from Dr. Leonard, Dr. Spivey, and Dr. Reider, which, according to counsel for the plaintiff, "would render her disabled" (doc. 28 at 1). The plaintiff also addresses the contention advanced bv the Commissioner that even if the ALJ erred in finding that the plaintiff could perform her past relevant work, there were other jobs that the plaintiff could perform (doc. 28 at 3). The plaintiff points out that the ALJ found that she could perform her past relevant work as a housekeeper, but indicates that the plaintiff had not worked as a housekeeper during the 15-year period established under the regulations for a job to be classified as past relevant work (doc. 28 at 3-4). Hence, according to the plaintiff, the ALJ should have proceeded to step five of the sequential evaluation process (doc. 28 at 4). The plaintiff also argues that the ALJ's reference in her opinion to the testimony of the vocational expert does not relieve her of the obligation to conduct an analysis under step five (doc. 28 at 5), and that the ALJ did not comply with "her affirmative duty" under SSR 00-4p to make findings that the vocational expert testimony was consistent with the *Dictionary of Occupational Titles* (doc. 28 at 5-6). The plaintiff requests that this court reverse the decision of the ALJ and enter a fully favorable decision

to the plaintiff or, in the alternative, that this case be remanded for further administrative proceedings (doc. 28 at 6).

### *Social Security Ruling 82-62 and the Plaintiff's Past Relevant Work*

As previously stated, the plaintiff argues that the ALJ failed to comply with the provisions of SSR 82-62 in the assessment of her past relevant work because she last performed work as a housekeeper more than 15 years before the ALJ's decision (doc. 25 at 14-15). The Commissioner indicates that the plaintiff's second and third allegations are actually a single claim (doc. 27 at 17), but acknowledges that there is "confusion" in the record as to whether the plaintiff worked as a housekeeper after 1995 (doc. 27 at 17 (citing Tr. 48-49, 201)). The Commissioner further argues that, under the regulations and SSR 82-62, the 15-year window is not a rigid rule and that work performed more than 15 years prior may be considered relevant if a continuity of skills, knowledge, and processes can be established between such prior work and a claimant's more recent occupations (doc. 27 at 18).

SSR 82-62 itself indicates that the 15-year period is *generally* the 15 years prior to the particular disability adjudication, but can also be the 15 years prior to the expiration of a claimant's insured status. 1982 WL 31386, at *2. The ruling also indicates that, while a claimant is the primary source for information on his or her past relevant work, an ALJ may consider a claimant's testimony, medical evidence, and documentary evidence from other sources:

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in

> some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.
>
> * * *
>
> Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).
>
> Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations.   * * *

SSR 82-62, 1982 WL 31386, at *3.

The "confusion in the record" acknowledged by the Commissioner resulted from the fact that the plaintiff worked as a cashier at Burger King, where she also cleaned the lobby (Tr. 49). The hearing transcript indicates that the housekeeper designation was a misunderstanding relating to an oral statement made by the plaintiff to Dr. Spivey (Tr. 49). A Form SSA-5002 completed by the Social Security Administration on August 19, 2010, also indicates that the plaintiff had not worked as a hotel housekeeper since 1995, but, after 1995, she had worked as a fast food worker and as a college cafeteria attendant (Tr. 201).

Aside from a brief discussion about whether the plaintiff worked as a cashier or a cleaner at Burger King (Tr. 38, 48-49), the ALJ hearing transcript reflects that the plaintiff was not questioned about her work as a hotel housekeeper. As a result, there was no determination by the ALJ as to whether there were continuity of skills, knowledge, and processes from her past occupation as a hotel housekeeper. The aforementioned documentary evidence clearly indicates that two of the plaintiff's past relevant jobs were as a fast food worker (DOT 311.472-010) and cafeteria attendant (DOT 311.677-014) (Tr. 48-49, 201). Moreover, the ALJ's finding that the plaintiff's past relevant work was as a

15

housekeeper appears to conflict with the ALJ's statement at the hearing that the "housekeeper" was the result of a misunderstanding (Tr. 49).

The ALJ's finding that the plaintiff could perform her past relevant work as a housekeeper does not comply with the requirements of Social Security Ruling 82-62, even though it is cited on page ten of the ALJ's decision (Tr. 28).  Social Security Ruling 82-62 indicates that the administrative fact-finder must make detailed findings relating to a claimant's past relevant work:

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

SSR 82-62, 1982 WL, at 31386, at *3.

Under SSR 82-62, a claimant who has had various jobs can have more than one past relevant job:  "If more than one job was performed during the 15-year period, separate descriptions of each job will be secured." 1982 WL 31386, at *3.  Hence, under SSR 82-62, the ALJ should have also made a determination as whether the plaintiff could perform her prior occupations as a fast food worker and as a cafeteria attendant.

In should be noted, however, that an administrative fact-finder, under SSR 82-62, is not precluded from determining that work performed outside the general 15-year period was past relevant work. *See* SSR 82-62, 1982 WL 31386, at *2 ("While the regulations provide that a claimant/beneficiary's work experience is usually relevant when the work 'was done within the last 15 years,' in some cases worked performed prior to the 15-year period may be considered as relevant when a continuity of skills, knowledge, and processes can be established between such work and the individual's more recent occupations.").

The Commissioner argues, in the alternative, that, even if the ALJ erred in determining that the plaintiff could perform her past relevant work, the error was harmless because the vocational expert testified that a person with the plaintiff's RFC could perform a significant number of other jobs (doc. 27 at 20).  However, it is not appropriate for this reviewing court to undertake its own step four and (if necessary) step five analysis.  Although the undersigned concludes that the ALJ's finding that the plaintiff's past relevant work was as a housekeeper is not supported by substantial evidence, there are no findings in the record currently before the court pertaining to a step four analysis of the plaintiff's past work as a fast food worker and as a cafeteria attendant.   *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) (allowing Social Security Administrative to utilize vocational expert testimony at step four of the sequential evaluation process and superannuating *Smith v. Bowen*, 837 F.2d 635, 637 (4th Cir. 1987)).  Further, while the ALJ did mention in her decision the vocational expert's testimony regarding other jobs that the hypothetical individual might be capable of performing (Tr. 28), the mere reference to such testimony did not absolve the ALJ from her responsibility to proceed to step five of the sequential evaluation process.  It should also be noted that while the ALJ refers to the jobs of laundry sorter and packager in her decision, she merely cites the existence of these jobs and makes no findings as to whether they exist in significant numbers in either the state or national economies (Tr. 28).  Moreover, as argued by the plaintiff, assuming that the ALJ's reference to the vocational expert testimony relieved her of the duty to make a step five analysis as imposed by the regulations, the reliance on such testimony to support her decision would nonetheless be improper, as the ALJ did not comply with her affirmative duty under SSR 00-4p to make findings in her decision as to whether the vocational expert's testimony was consistent with the *Dictionary of Occupational Titles*.  *See* SSR 00-4p, 2000 WL 1898704, at *4.

Based upon the foregoing, the above-captioned case should be remanded for an administrative determination as to: (1) what was the plaintiff's past relevant work(s); (2) can the plaintiff perform her past relevant work; and (3) if the plaintiff cannot perform her past relevant work, can she perform other work. *See Lockwood v. Colvin*, C.A. No. 8:12–cv-2930-DCN, 2014 WL 995072, at *5 (D.S.C. Mar. 13, 2014) ("Therefore, the ALJ's decision is deficient according to SSR 82–62 and cannot be adequately reviewed by the court."); *Sartor v. Astrue*, C.A. No. 3:11-cv-2703-RBH, 2013 WL 808836, at *4 & n. 2 (D.S.C. Mar. 5, 2013) (remanding for findings under SSR 82-62). When reviewing the case on remand, the ALJ should be instructed to consider each of the plaintiff's other allegations of error.

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald  
United States Magistrate Judge

July 15, 2014  
Greenville, South Carolina